UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| WILLIAM PLADSON and LEE MCINTOSH | * | |
| | * | |
| | * | |
| Plaintiffs, | * | CIVIL ACTION NO. 2:23-cv-6408 |
| | * | |
| | * | SECTION: |
| VERSUS | * | |
| | * | MAGISTRATE JUDGE: |
| MICHAEL DEPETRILLO and METEOR, L.L.C. | * | |
| | * | **JURY TRIAL DEMANDED** |
| | * | |
| Defendants. | * | |
| * * * * * * * * * * * * * * * * * * * * * * | * | |

---

## COMPLAINT FOR DAMAGES

---

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs, William Pladson (hereinafter referred to as "Bill") and Lee Mcintosh (hereinafter referred to as "Lee," and together with Bill, "Plaintiffs"), who respectfully submit the following Complaint for Damages against Defendants Michael DePetrillo (hereinafter referred to as "DePetrillo") and Meteor, L.L.C. (hereinafter referred to as "Meteor," and together with DePetrillo, "Defendants"):

1.

In this investment fraud action, Plaintiffs seek to recover damages caused by Defendants' acts and omissions concerning certain investment securities sold by Defendants to Plaintiffs. As explained in more detail below, Defendants are liable under various legal theories, including violations of the Louisiana Securities Law, fraud in the inducement, fraud, detrimental reliance, breach of fiduciary duty, and gross negligence.

1

## PARTIES

2.

Plaintiff, William Pladson, is a resident and domiciliary of Fargo, North Dakota.

3.

Plaintiff, Lee Mcintosh, is a resident and domiciliary of Fargo, North Dakota.

4.

Defendant, Michael DePetrillo, is, upon information and belief, a resident and domiciliary of New Orleans, Louisiana.

5.

Defendant, Meteor, L.L.C., is a Louisiana limited liability company having its principal place of business in New Orleans, Louisiana. On information and belief, DePetrillo is the sole owner and member of Meteor. On information and belief, Meteor is also a domiciliary of Louisiana and is not a domiciliary of North Dakota.

## JURISDICTION AND VENUE

6.

The amount in controversy exceeds $75,000.

7.

Thus, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship between the parties.

8.

This Court has jurisdiction over the Defendants because they are domiciled in New Orleans, Louisiana and have sufficient minimum contracts with this District so as to render the

2

exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.

Venue is proper in this Court because one or more of the Defendants reside in or maintain a principal place of business in this District; a substantial portion of the transactions and wrongs complained of herein were committed and/or occurred in this District; and Defendants have received substantial compensation and improper benefits in this District by doing business here and engaging in numerous activities here.

## FACTUAL ALLEGATIONS

10.

Defendants are in the investment advisory and/or trading business, and they hold themselves out as experts in the field of investments and trading.

11.

On information and belief, DePetrillo and Meteor are not licensed securities salesmen or dealers in the State of Louisiana, where they reside, or the State of North Dakota, where Plaintiffs reside.

12.

In their ongoing communications with Plaintiffs, Defendants led Plaintiffs to believe that Defendants had a special expertise in assessing Plaintiffs' investment needs and the handling of Plaintiffs' investment funds. Defendants assured Plaintiffs that Plaintiffs could place their trust and confidence in Defendants and that Defendants would place Plaintiffs' interest ahead of Defendants' interest.

13.

Defendants knew and understood that Plaintiffs were looking to them for professional guidance and advice, and Plaintiffs followed Defendants' recommendations and advice.

14.

But Defendants did not put Plaintiffs' interests ahead of their own. On the contrary, Defendants put their interest in their own income ahead of Plaintiffs' interest, and they breached several duties owed to Plaintiffs.

15.

After Plaintiffs were introduced to DePetrillo through a common acquaintance, DePetrillo advised Plaintiffs that he was an investment professional handling the investment funds for several other investors (some with whom Plaintiffs were familiar) and that he would like to offer his services to Plaintiffs as well.

16.

DePetrillo worked hard to convince Plaintiffs to purchase interests in his investment fund (the "Investments").

17.

The Investments were securities but, on information and belief,  were not registered with either the Securities and Exchange Commission or any state securities regulator; and they failed to qualify for any exemption from registration.

18.

To induce Plaintiffs to purchase the Investments, DePetrillo made a number of materially false and misleading statements to Plaintiffs.

19.

DePetrillo assured Plaintiffs that he had developed a proven strategy to make money at very low risk in the foreign exchange and/or derivative markets.  He also claimed that he would use stop-loss orders on all trades to limit any potential downside.

20.

Not only that, DePetrillo advised Plaintiffs that there was a monthly loss limit of only 5%. That is, DePetrillo promised Plaintiffs that they could not lose more than 5% of their investments over the course of one month.

21.

In fact, DePetrillo advised that the worst that he had done in any of the last 8 years was generate a 40% return for his investors in a given year.

22.

DePetrillo advised Plaintiffs that the Investments would provide Plaintiffs with investment diversification benefits and reduce Plaintiffs' overall investment risk due to the Investments' low correlation to more traditional investments.

23.

DePetrillo assured Plaintiffs that he could and would consistently generate positive returns regardless of general market conditions.

24.

DePetrillo also advised Plaintiffs that he worked closely with an unnamed broker who had agreed to match 20% of their deposits, meaning for every $100 that Plaintiffs invested, they would receive an additional $20.

25.

DePetrillo also promised Plaintiffs that they could withdraw their investment funds (in whole or in part) at any time with 4 weeks' notice.

26.

Following DePetrillo's advice and recommendations, Lee initially purchased over $125,000 in Investments from DePetrillo, including a $50,000 investment made in November 2022 and a $78,748.45 investment made in April 2023.

27.

Similarly, following DePetrillo's advice and recommendations, Bill initially purchased $250,000 in Investments from DePetrillo in March 2023.

28.

All of the funds for Plaintiffs' Investments were sent to the account of DePetrillo's company, Meteor.

29.

DePetrillo periodically provided summaries of Plaintiffs' Investments to Plaintiffs, and these summaries *always* showed that Plaintiffs' Investments, including the supposed matches provided by DePetrillo's unnamed broker, had increased in value.   That is, the supposed value of Plaintiffs' Investments never went down; they only went up.

30.

By the beginning of May 2023, DePetrillo represented that Bill's Investments were worth over $340,000 and that Lee's Investments were worth over $230,000.

31.

On information and belief, DePetrillo's summaries included false and materially misleading figures and were designed to induce Plaintiffs not only to remain in the Investments but also to purchase additional investments from DePetrillo.

32.

DePetrillo later advised Plaintiffs that he had identified some sort of short-term opportunity for arbitrage in connection with a gold options contract, but he stressed that he needed Plaintiffs' investment proceeds right away.

33.

Lee advised DePetrillo that he did not have any additional funds available to invest, so DePetrillo advised Lee to withdraw the money from Lee's individual retirement account ("IRA") maintained at Edward Jones.

34.

According to DePetrillo, Lee could withdraw the money from his IRA, DePetrillo could invest the money on a short-term basis, DePetrillo could return the money plus a handsome profit back to Lee within 60 days, and Lee could then deposit the money back into his IRA and avoid having to pay any early withdrawal penalties, taxes, or interest.

35.

Lee followed DePetrillo's advice, withdrew $300,000 from his IRA, and invested the money with DePetrillo.  According to DePetrillo, he was going to use $100,000 in connection with the gold options contract and use the remaining $200,000 on short-term trading.

36.

Bill also provided DePetrillo with an additional $300,000 at this time.  DePetrillo advised Bill that the entire $300,000 would be used in connection with the gold options contract.

37.

As was the case with Plaintiffs' earlier Investments, DePetrillo advised Plaintiffs that their short-term investment in a gold options contract had been successful.  By the end of June 2023, DePetrillo advised Bill that his investment in the gold options contract was worth approximately $345,000 and advised Lee that his investment in the gold options contract was worth approximately $115,000.

38.

Lee immediately requested that DePetrillo return the $300,000 that had been withdrawn from his IRA account so that he could maintain these tax-exempt funds for other investments in his IRA and avoid any penalties, taxes, and interest associated with an early withdrawal from his IRA.

39.

Bill immediately requested that DePetrillo return the $300,000 plus the profit that he had supposedly earned on the gold options contract.

40.

On June 22, 2023, DePetrillo sent Lee a check for $300,000, and on July 3, 2023, DePetrillo sent Bill a check for $343,951.64.  The checks were issued from DePetrillo's Meteor account at Chase Bank.

41.

Both of these checks were dishonored for non-sufficient funds ("NSF").

42.

DePetrillo later promised Lee that he would reimburse him for all penalties and tax implications resulting from DePetrillo's failure to honor his earlier promise to return the $300,000 to Lee's IRA account within 60 days.

43.

DePetrillo continued to provide summaries of Plaintiffs' Investments to Plaintiffs.  As of DePetrillo's last updates, Bill's other Investments were worth approximately $415,000 and Lee's Investments were worth approximately $650,000.

44.

Both Lee and Bill subsequently requested the return of all of their investment funds from Defendants.  Despite several requests and despite several personal assurances from DePetrillo, Defendants have not returned any of Plaintiffs' Investment funds.

45.

Instead, DePetrillo has made many, many false assurances and guarantees that the money would be returned, but his promises never come to fruition.  He has even claimed to have wired certain funds to Plaintiffs at various times, but these wires never appear in Plaintiffs' accounts.

46.

Eventually, DePetrillo stopped returning Plaintiffs' calls and text messages.

47.

Then, at the end of September 2023, Plaintiffs each received mysterious emails from a man supposedly named "Mark Walton" who purported to be the "new CEO of Meteor."  He claimed that he was working on some sort of insurance claim relating to Plaintiffs' investments in the gold option contract.

48.

Plaintiffs immediately asked to speak to Mr. Walton.  Although Mr. Walton promised to call "tomorrow," Plaintiffs have still never heard from him or been able to confirm that he actually exists.

49.

Plaintiffs have since learned that DePetrillo is being sued by, at least, his landlord (for failing to pay his rent), his credit card company (for failing to pay his bills), and a factoring company (for defaulting on a contract for the sale of Meteor's receivables).

50.

At this point, Plaintiffs reasonably believe that DePetrillo has been operating a Ponzi scheme or has otherwise stolen or lost their investment funds and has no intention of returning them to Plaintiffs.

51.

Suffice it to say, had DePetrillo provided them with full and accurate information regarding, among other things, his supposed investment strategy, the Investments, or Plaintiffs' ability to recover their funds, Plaintiffs never would have purchased the Investments or invested in DePetrillo's supposed gold options contract.  Further, Lee never would have withdrawn any funds from his IRA account and incurred the taxes and penalties associated with the withdrawal.

52.

As a result of their unlawful conduct, Defendants are liable to Plaintiffs for the damages that they have suffered, including, but not limited to, loss of their investment proceeds, loss of profits, loss of investment opportunities, increased taxes, and other damages.

## <u>COUNT I: UNLAWFUL SALE OF UNREGISTERED SECURITIES</u>
## <u>IN VIOLATION OF LOUISIANA SECURITIES LAW</u>

### 53.

Plaintiffs reassert, reaver, and incorporate by reference each of the preceding allegations of the Complaint as if pleaded herein, *in extenso.*

### 54.

Pursuant to the Louisiana Securities Law at La. R.S. 51:705 and 51:712(A), it is unlawful for any person to offer for sale or sell any securities in Louisiana unless they comply with the registration requirements of the Louisiana Securities Law, or an exemption to registration applies.

### 55.

Defendants offered for sale unregistered securities and sold such securities to Plaintiffs in violation of the registration requirements of La. R.S. 51:705, and on information and belief, no exemption to the registration requirement applies.

### 56.

Defendants are liable to Plaintiffs, pursuant to the Louisiana Securities Law at La. R.S. 51:714, for the unlawful offer and sale of unregistered securities.

### 57.

Pursuant to the Louisiana Securities Law, Defendants are liable to Plaintiff for the consideration paid for the securities, with interest thereon from the date of payment to the date of repayment, as computed in La. R.S. 51:714, together with all costs and reasonable attorney's fees.

## COUNT II: SALE OF SECURITIES BY UNREGISTERED SECURITIES DEALERS AND SALESMAN IN VIOLATION OF LOUISIANA SECURITIES LAW

58.

Plaintiffs reassert, reaver, and incorporate by reference each of the preceding allegations of the Complaint as if pleaded herein, *in extenso.*

59.

Pursuant to the Louisiana Securities Law at La. R.S. 51:703 and 51:712(A), it is unlawful for any unregistered dealer or salesman to sell or offer to sell securities, unless an exemption to registration applies.

60.

None of the Defendants were registered to sell or solicit the sales of securities. Despite lacking required registrations, Defendants solicited, offered and sold securities to Plaintiffs.  On information and belief, Defendants did not qualify for any exemptions to registration.

61.

Pursuant to the Louisiana Securities Law, Defendants are liable to Plaintiffs for the consideration paid for the securities, with interest thereon, from the date of payment down to the date of repayment as computed in La. R.S. 51:714, together with all costs and reasonable attorney's fees.

## COUNT III: SALE OF SECURITIES BY MEANS OF MISREPRESENTATIONS AND OMISSIONS OF MATERIAL FACT IN VIOLATION OF LOUISIANA SECURITIES LAW

62.

Plaintiffs reassert, reaver, and incorporate by reference each of the preceding allegations of the Complaint as if pleaded herein, *in extenso.*

12

63.

Pursuant to the Louisiana Securities Law at La. R.S. 51:712(A), it is unlawful to offer to sell or to sell a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

64.

Defendants are liable to Plaintiffs, pursuant to the Louisiana Securities Law, for the sale of securities to Plaintiffs, and materially aiding the sale of securities to Plaintiffs, based upon misrepresentations and the omission of material facts by Defendants, including but not limited to:

a)  Misrepresentations concerning the risks associated with the investments sold by DePetrillo;

b)  Misrepresentations concerning the supposed safety of DePetrillo's trading strategy;

c)  Misrepresentations concerning DePetrillo's ability to consistently generate positive returns;

d)  Misrepresentations concerning the 20% investment match supposedly provided by DePetrillo's broker;

e)  Misrepresentations concerning DePetrillo's past investment performance;

f)  Misrepresentations concerning the monthly "loss limits" of the investments;

g)  Misrepresentations concerning Plaintiffs' ability to withdraw their investment funds with 4 weeks' notice;

h)  Misrepresentations concerning DePetrillo's ability to return Lee's IRA funds within 60 days;

i)  Misrepresentations concerning the amount of other investments managed by Defendants;

j)  Misrepresentations concerning the arbitrage opportunity associated with the gold options contract;

k)  Failure to disclose that DePetrillo was operating a Ponzi scheme; and

l)   Failure to disclose that DePetrillo intended to steal, rather than invest, Plaintiffs'
investment funds.

65.

Plaintiffs unquestionably relied on the foregoing misrepresentations and omissions in
making the decision to purchase investments from Defendants.

66.

Pursuant to the Louisiana Securities Law, Defendants are liable to Plaintiffs for the
consideration paid for the securities, with interest thereon from the date of payment down to the
date of repayment, as computed in La. R.S. 51:714, together with all costs and reasonable
attorney's fees.

## COUNT IV: FRAUD IN THE INDUCEMENT

67.

Plaintiffs reassert, reaver, and incorporate by reference each of the preceding allegations of
the Complaint as if pleaded herein, *in extenso*.

68.

Defendants misrepresented and omitted material facts from Plaintiffs for the purpose of
inducing them to purchase investments from Defendants.

69.

Defendants' investments with Plaintiffs are due to be rescinded because Plaintiffs' consent
was vitiated.

70.

Therefore, Plaintiffs were in error as to a principal cause of the investments as a result of Defendants' fraudulent misrepresentations and omissions. At a minimum, Plaintiffs' error concerned a circumstance that substantially influenced their consent.

71.

As a result of Defendants' fraudulent inducement, Plaintiffs are entitled to rescission of the contracts with Defendants, as well as damages and attorney's fees.

## COUNT V: FRAUD and MISREPRESENTATION

72.

Plaintiffs reassert, reaver, and incorporate by reference each of the preceding allegations of the Complaint as if pleaded herein, *in extenso*.

73.

As discussed above, Defendants misrepresented and omitted material facts in their communications with Plaintiffs to obtain an unjust advantage over them and to cause Plaintiffs to turn over their investment funds to Defendants.

74.

Defendants' misrepresentations and omissions were done with actual malice, with the intent to mislead Plaintiffs, and with the specific intent to have Plaintiffs rely on said misrepresentations and omissions.  At a minimum, the misrepresentations and omissions were done recklessly, without knowledge of their truth or falsity.

75.

Defendants' conduct constitutes fraud and misrepresentation; and it has caused significant damages to Plaintiffs for which Defendants are liable.

## COUNT VI: DETRIMENTAL RELIANCE

76.

Plaintiffs reassert, reaver, and incorporate by reference each of the preceding allegations of the Complaint as if pleaded herein, *in extenso*.

77.

Defendants are also liable under the law of detrimental reliance, which is designed to prevent injustice by barring parties from taking a position contrary to their own prior acts, admissions, representations, or silence.

78.

Plaintiffs, to their detriment, relied upon the representations and upon the completeness of the information that Defendants provided to them. In particular, but not intended to be all-inclusive, Plaintiffs relied on Defendants' representations regarding the soundness of Defendants' investment strategy, the strength and viability of the Investments, the Investments' appropriateness for Plaintiffs' funds. Plaintiffs also relied on Defendants' promises concerning the investment match, the loss limits, Plaintiffs' ability to withdraw their funds, and Defendants ability to return Lee's IRA funds within 60 days.

79.

Plaintiff was reasonable in relying on Defendants' representations and silence.

80.

Because of Defendants' representations, omissions, and promises, Plaintiffs incurred significant tax liability and invested significant sums in investments recommended by Defendants that they would not otherwise have and suffered other damages.

81.

As a result of Plaintiffs' justifiable reliance on Defendants' representations and promises and as a result of Defendants' failure to provide critical, accurate information, Plaintiffs incurred damages for which Defendants are liable.

## COUNT VII:  BREACH OF FIDUCIARY DUTY

82.

Plaintiffs reassert, reaver, and incorporate by reference each of the preceding allegations of the Complaint as if pleaded herein, *in extenso.*

83.

Defendants acted in a fiduciary capacity as investment advisors and/or traders for Plaintiffs and owed Plaintiffs fiduciary duties, including, but not limited to: (a) the duty to disclose all material, known risks in the purchase or sale of a security; (b) the duty to recommend an investment strategy and specific investment only after studying it sufficiently; (c) the duty not to misrepresent any fact material to the transaction; (d) the duty to act in the best interests of Plaintiffs; (e) the duty to provide accurate information about the status and value of Plaintiffs' investments; and (f) general duties of fair dealing. Those duties were breached. Plaintiffs placed complete confidence and trust in Defendants to handle Plaintiffs' investments, and Defendants breached that trust to the detriment of Plaintiffs.

84.

At all relevant times, a fiduciary relationship existed between Defendants and Plaintiffs by reason that:

a)	Defendants at all times possessed superior knowledge, judgment, skill, and experience in the securities market in contrast to Plaintiffs;

17

b) Defendants, at all times, held themselves out as trusted investment advisors and traders who would always place Plaintiffs' interest ahead of their own;

c) Defendants made investment decisions for Plaintiffs' investment funds and accounts, and they acted as Plaintiffs' agent; and

d) Defendants knew that Plaintiffs were relying on them for advisory services and investment guidance.

85.

Defendants' actions constituted self-dealing, breach of their duty of loyalty, and breach of trust on the part of a fiduciary.

86.

Defendants breached their fiduciary duties through the conduct set forth in detail above and by placing their interest in their own income over Plaintiffs' interest in investing in suitable and appropriate investments and in maximizing the value of their assets as they grew older.

87.

Because of the fiduciary relationship between Plaintiffs and Defendants, Plaintiffs reasonably relied to their detriment on Defendants' superior knowledge, skill, judgment, and experience in handling their investment funds.

88.

These breaches caused damage to Plaintiffs in an amount to be proven at trial.

## **COUNT VIII: NEGLIGENCE AND CROSS NEGLIGENCE**

89.

Plaintiffs reassert, reaver, and incorporate by reference each of the preceding allegations of the Complaint as if pleaded herein, *in extenso*.

90.

As investment advisory and/or trading professionals, Defendants owed Plaintiffs duties of care to act prudently and to investigate the safety and propriety of the investments they recommended and sold to Plaintiffs.

91.

By recommending and selling investments that were fraudulent and/or by squandering or stealing Plaintiffs' investment funds, Defendants were grossly negligent and fell far below the standard of care expected of professionals.

92.

By reason of Defendants' negligence, Plaintiffs have been damaged, in an amount to be proven at trial, including the loss of their investment, and such damages were the direct, natural and proximate consequence of the Defendants' negligence.

93.

Accordingly, Plaintiffs are entitled to an award representing damages resulting from Defendants' gross negligence, disgorgement by Defendants of any compensation that they may have received.

94.

The services offered by Defendants were intended to gratify non-pecuniary interests including to help provide peace of mind and security in Plaintiffs' retirement. By breaching their duties, Defendants caused Plaintiffs mental anguish, distress, inconvenience, and aggravation for which they are entitled to recover damages.

## JURY DEMAND

### 95.

Plaintiffs demand a jury on any issue properly tried to a jury.

## RESERVATION OF RIGHTS

### 96.

There are a great deal of documents and information that are within Defendants' possession, custody, or control to which Plaintiffs do not have access. Such documents and information will likely support Plaintiffs' existing claims and may give rise to additional claims or theories of liability against Defendants. As such, Plaintiffs reserve the right to assert additional claims after discovery in this case and reserve the right to seek relief from Defendants under any other viable legal theory that may be proven by the facts and evidence at trial.

**WHEREFORE**, Plaintiffs respectfully request that, after due proceedings are held, judgment be entered in their favor and against Defendants granting Plaintiffs the following relief:

(a)   Compensatory, consequential and recessionary damages, including mental anguish, emotional distress, loss of enjoyment and lost opportunity damages, in an amount to be proven at trial;

(b)   Interest from the date of their investments through the date of repayment;

(c)   Disgorgement of all fees and compensation earned by Defendants;

(d)   Attorneys' fees, interest, and costs; and

(e)   Such other and further relief as the Court deems just and proper.

Respectfully Submitted:

*/s/ Lance C. McCardle*
Lance C. McCardle (LA Bar No. 29971)
Jason W. Burge (LA Bar No. 30420)
**FISHMAN HAYGOOD, L.L.P.**
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone:  (504) 586-5252
Facsimile:  (504) 586-5250
*Counsel for Plaintiffs William Pladson and Lee Mcintosh*